**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

---

ALL EUROPEAN AUTO SUPPLY, INC.,
individually and on behalf of a class of all others
similarly situated,

                Plaintiff,

v.

DENSO CORPORATION, DENSO
INTERNATIONAL AMERICA INC., DENSO
INTERNATIONAL KOREA CORPORATION,
ASMO NORTH AMERICA, LLC, ASMO NORTH
CAROLINA, INC.,  MITSUBA CORPORATION,
AMERICAN MITSUBA CORPORATION,
ROBERT BOSCH GMBH, BOSCH ELECTRICAL
DRIVES CO., LTD., and ROBERT BOSCH LLC,

                Defendants.

Case No. _____

---

## CLASS ACTION COMPLAINT

Plaintiff All European Auto Supply, Inc. ("Plaintiff"), individually and on behalf of the

proposed class of direct purchasers of Power Window Motors (as defined below), brings this

action against Defendants DENSO Corporation, DENSO International America Inc., DENSO

International Korea Corporation, ASMO North America, LLC, ASMO North Carolina, Inc.,

Mitsuba Corporation, American Mitsuba Corporation, Robert Bosch GmbH, Bosch Electrical

Drives Co., Ltd., and Robert Bosch LLC (collectively, "Defendants"), and other unnamed co-

conspirators, for damages under the antitrust laws of the United States and demands a jury trial,

and, upon personal information as to the facts pertaining to itself and upon information and belief

as to all other matters, hereby alleges as follows:

## INTRODUCTION

1.      The United States Department of Justice (the "DOJ"), in conjunction with various domestic and foreign governmental agencies, is currently conducting an investigation into the automotive parts industry that one DOJ official described as "**appear[ing] to be the biggest criminal antitrust investigation that we've ever encountered**."  The DOJ's investigation encompasses a wide array of automotive parts and has already yielded billions of dollars in criminal fines as well as dozens of prison sentences.

2.      Some of the parts being investigated include "Power Window Motors," which are small electric motors used to raise and lower windows in a motor vehicle.

3.      Defendants are competing manufacturers of Power Window Motors sold throughout the United States, or installed in motor vehicles manufactured or sold throughout the United States, that, together with their as-yet unknown co-conspirators, entered into an agreement, combination, or conspiracy to fix, raise, maintain, and/or stabilize prices, rig bids, and allocate the market and customers in the United States for Power Window Motors.  This agreement, combination, or conspiracy constituted an unreasonable restraint of interstate trade and foreign trade and commerce in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

4.      Defendant Mitsuba Corporation has already pled guilty to participating in a conspiracy to rig bids for, and to fix stabilize, and maintain the prices of, Power Window Motors (and other automotive parts) in violation of the Sherman Act, and paid a $135 million criminal fine.

5.      Defendants DENSO Corporation and Robert Bosch GmbH have already pled guilty to participating in conspiracies to rig bids for, and to fix stabilize, and maintain the prices of, various other automotive parts in violation of the Sherman Act.

6.      As a direct and foreseeable result of the unlawful and anticompetitive conduct alleged herein, Plaintiff and others like it paid artificially inflated prices for Power Window Motors during the period starting at least as early as January 1, 2000 and continuing to the present (the "Class Period").

7.      Plaintiff seeks to represent a class of direct purchasers consisting of all persons and entities who, during the Class Period, purchased Power Window Motors in the United States from one or more of the Defendants or their co-conspirators.

## JURISDICTION AND VENUE

8.      Plaintiff brings this action to obtain injunctive relief and to recover treble damages, costs of suit, and reasonable expenses and attorneys' fees, resulting from Defendants' violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

9.      The Court has subject matter jurisdiction over this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and 28 U.S.C. §§ 1331 and 1337.

10.      The Court has personal jurisdiction over each of the Defendants as each of them, either directly or through the ownership or control of their United States subsidiaries, (a) resides in this District, (b) transacted business throughout the United States, including in this District, (c) sold or marketed substantial quantities of Power Window Motors throughout the United States, including in this District, (d) committed overt acts in furtherance of the conspiracy alleged herein in the United States, including in this District, (e) was engaged in a conspiracy that was directed at, and had a direct, substantial, and reasonably foreseeable and intended effect of causing injury to the business or property of persons and entities throughout the United States, including in this District, or (f) had substantial aggregate contacts with the United States as a whole, including in this District.

3

11.     Venue is proper in this District pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b), (c), and (d) because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, one or more of the Defendants reside in this District, and a substantial portion of the affected interstate trade and commerce has been carried out in this District.

## PARTIES

### Plaintiff

12.     Plaintiff All European Auto Supply, Inc. ("AEAS") is a Michigan corporation with its principal place of business in Royal Oak, Michigan.  AEAS purchased Power Window Motors directly from one or more of the Defendants and/or their co-conspirators during the Class Period and suffered injury as a result of Defendants' unlawful conduct.

### Defendants

**The DENSO Defendants**

13.     Defendant DENSO Corporation is a Japanese corporation with its principal place of business in Kariya, Japan.  DENSO Corporation – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Power Window Motors that were purchased throughout the United States, including in this District, during the Class Period.

14.     Defendant DENSO International America, Inc. is a Delaware corporation with its principal place of business in Southfield, Michigan.  DENSO International America, Inc., a wholly owned subsidiary of Defendant DENSO Corporation, manufactured, marketed, and/or sold Power Window Motors that were purchased throughout the United States, including in this

4

District, during the Class Period.  At all times during the Class Period, its activities in the United States were under the control and direction of its parent company.

15.     Defendant DENSO International Korea Corporation is a Korean corporation with its principal place of business in Uiwang-si, South Korea.   DENSO International Korea Corporation, a wholly owned subsidiary of Defendant DENSO Corporation, manufactured, marketed, and/or sold Power Window Motors that were purchased throughout the United States, including in this District, during the Class Period.  At all times during the Class Period, its activities in the United States were under the control and direction of its parent company.

16.     ASMO North America, LLC is a Delaware corporation with its principal place of business in Statesville, North Carolina.  ASMO North America, LLC, a wholly owned subsidiary of ASMO Co., Ltd. (a subsidiary of Defendant DENSO Corporation), is the parent company of Defendant ASMO North Carolina, Inc.  According to its website, ASMO North America, LLC "coordinates the business activities of all affiliates in North America."  ASMO North America, LLC – directly and/or through its subsidiaries or affiliates, which it owned and/or controlled – manufactured, marketed, and/or sold Power Window Motors that were purchased throughout the United States, including in this District, during the Class Period.

17.     ASMO North Carolina, Inc. is a North Carolina corporation with its principal place of business in Statesville, North Carolina.  ASMO North Carolina, Inc., a subsidiary of ASMO North America, LLC, manufactured, marketed, and/or sold Power Window Motors that were purchased throughout the United States, including in this District, during the Class Period. At all times during the Class Period, the activities of ASMO North Carolina, Inc. were under the control and direction of its parent ASMO North America, LLC and/or its ultimate corporate parent DENSO Corporation.

5

18.     Defendants DENSO Corporation, DENSO International America, Inc., DENSO International Korea Corporation, ASMO North America, LLC, and ASMO North Carolina, Inc. are collectively referred to herein as "DENSO" or the "DENSO Defendants."

**The Mitsuba Defendants**

19.     Defendant Mitsuba Corporation is a Japanese corporation with its principal place of business in Gunma, Japan.  Mitsuba Corporation – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Power Window Motors that were purchased throughout the United States, including in this District, during the Class Period.

20.     Defendant American Mitsuba Corporation is an Illinois corporation with its principal place of business in Novi, Michigan.  American Mitsuba Corporation, a wholly owned subsidiary of Defendant Mitsuba Corporation, manufactured, marketed, and/or sold Power Window Motors that were purchased throughout the United States, including in this District, during the Class Period.  At all times during the Class Period, its activities in the United States were under the control and direction of its parent company.

21.     Defendants Mitsuba Corporation and American Mitsuba Corporation are collectively referred to herein as "Mitsuba" or the "Mitsuba Defendants."

**The Bosch Defendants**

22.     Defendant Robert Bosch GmbH is a German company with its principal place of business in Stuttgart, Germany.  Robert Bosch GmbH – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Power Window Motors that were purchased throughout the United States, including in this District, during the Class Period.

6

23.     Bosch Electrical Drives Co., Ltd. is a Korean company with its principal place of business in Sejong, South Korea.  It is a wholly owned subsidiary of Defendant Robert Bosch GmbH.  Bosch Electrical Drives Co., Ltd, directly and/or through its affiliates, manufactured, marketed, and/or sold Power Window Motors that were purchased throughout the United States, including in this District, during the Class Period.  At all times during the Class Period, the activities of Bosch Electrical Drives Co., Ltd and its affiliates were under the control and direction of Robert Bosch GmbH.

24.     Defendant Robert Bosch LLC is a Delaware company with its principal place of business in Farmington Hills, Michigan.  Robert Bosch LLC, a wholly owned subsidiary of Defendant Robert Bosch GmbH and affiliate of Defendant Bosch Electrical Drives Co., Ltd., operates factories and distribution facilities in several states, including at least Illinois, Michigan, Massachusetts, Tennessee, and South Carolina.  Robert Bosch LLC, directly and/or through its affiliates, manufactured, marketed, and/or sold Power Window Motors that were purchased throughout the United States, including in this District, during the Class Period.  At all times during the Class Period, the activities of Robert Bosch LLC and its affiliates were under the control and direction of its parent Robert Bosch GmbH and/or its affiliate Bosch Electrical Drives Co., Ltd.

25.     Defendants Robert Bosch GmbH, Bosch Electrical Drives Co., Ltd., and Robert Bosch LLC are collectively referred to herein as "Bosch" or the "Bosch Defendants."

## AGENTS AND CO-CONSPIRATORS

26.     Various persons or firms not named as Defendants have participated as co-conspirators in the violations alleged herein and have performed acts and made statements in

furtherance thereof.  The Defendants are jointly and severally liable for the acts of their co-conspirators whether named or not named as Defendants in this Complaint.

27.     The acts alleged herein that have been performed by Defendants were authorized, ordered, and performed by their officers, directors, agents, employees, or representatives while engaged in the management, direction, control, or transaction of the Defendants' business affairs.

28.     Each Defendant acted as the agent, principal, or joint venturer of the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

29.     The acts alleged herein that have been performed by Defendants DENSO International America Inc., DENSO International Korea Corporation, ASMO North America, LLC, ASMO North Carolina, Inc., American Mitsuba Corporation, Bosch Electrical Drives Co., Ltd., and Robert Bosch LLC were authorized, ordered, and condoned by their respective parent companies.

## FACTUAL ALLEGATIONS

### A.  Product Description: Power Window Motors

30.     "Power Window Motors" are small electric motors used to raise and lower windows in a motor vehicle.

31.     Power Window Motors are installed by automobile original equipment manufacturers ("OEMs") in new cars as part of the automotive manufacturing process.  They also are installed in automobiles to replace failing, defective, or damaged Power Window Motors.

32.     Defendants and their co-conspirators supplied Power Window Motors that were: 1) manufactured in the United States and installed in motor vehicles manufactured in the United States or used for replacement parts for motor vehicles in the United States; 2) manufactured

8

abroad, exported to the United States, and installed in motor vehicles manufactured and sold in the United States; and 3) manufactured abroad and exported into the United States for use as replacement parts for motor vehicles in the United States.

**B. The Power Window Motors Market**

33.     The Power Window Motors market has certain characteristics that are conducive to a price-fixing conspiracy and that make Defendants' conspiracy more plausible, namely there are high barriers to entry and demand for the product is inelastic.

34.     There are substantial barriers to entry in the Power Window Motors market as any new entrant would face costly and lengthy start-up costs, including manufacturing plants and equipment, research and development, transportation, distribution infrastructure, the obtaining of skilled labor, and the existence of long-standing relationships between customers and suppliers. Furthermore, Defendant Mitsuba owns several patents related to the manufacture of Power Window Motors that further inhibit market entry.

35.     Demand for Power Window Motors is highly inelastic—*i.e.*, sellers of Power Window Motors can increase prices with little or no decline in units sold.  This is because there are no viable substitutes for these products and Power Window Motors are an essential part of modern motor vehicles (even if prices are kept at a supra-competitive level).

**C. The Request for Quotation Process**

36.     When procuring parts such as Power Window Motors for manufacturing a new motor vehicle, an OEM issues a Request for Quotation ("RFQ").   Automotive parts manufacturers, such as the Defendants, then submit a bid or quotation to the OEM in response to the RFQ.

37.     The RFQ process is designed to obtain competitive, independent bids from multiple suppliers.   To that end, an OEM will issue the RFQ to multiple competing parts suppliers, those suppliers will submit bids, and the OEM will select a winner (usually the lowest bid).  Sometimes, before selecting the winner, an OEM or the suppliers may revise the technical specifications, and revised bids will be submitted.

38.     The parts purchased by the OEM in connection with that RFQ are purchased from the winning parts manufacturer for the lifespan of the motor vehicle model, which on average is between four to six years.  During that time frame, whenever an OEM purchases Power Window Motors for that motor vehicle model, the OEM purchases the Power Window Motors from the parts manufacturer who won the RFQ and was awarded the supply contract, at the price set by that supply contract.

39.     The prices set by the RFQ process are also used when direct purchasers other than the OEM who issued the RFQ purchase Power Window Motors from the Defendants, such as those purchasing Power Window Motors to replace parts as they become worn or damaged. Every subsequent purchaser who buys Power Window Motors from that Defendant pays at least the winning price set by the RFQ or higher.

40.     Thus, the RFQ process described above not only sets the prices for Power Window Motors incorporated into new motor vehicles manufactured by that particular OEM, it also sets the price floor for all other direct purchasers, including those making purchases for use as replacement and aftermarket parts.

**D. Defendants' Power Window Motors Conspiracy**

41.     During the Class Period, Defendants and their co-conspirators engaged in a single conspiracy to raise, fix, maintain, and/or stabilize prices for Power Window Motors by price-

fixing, rigging bids for, and allocating the market and customers of Power Window Motors sold in or into the United States.

42.     In furtherance of that conspiracy, Defendants participated in meetings, telephone conversations, emails, and other communications in order to discuss bids and price quotations for Power Window Motors sold in or into the United States, and agreed to rig bids and allocate the supply of those Power Window Motors.  Defendants then submitted as part of the RFQ process bids and price quotations to the OEMs in accordance with those conspiratorial agreements.

43.     Defendants knew and intended that their conduct would impact not only Power Window Motors sold to the OEMs as a result of the rigged bidding processes, but also the Power Window Motors sold to all direct purchasers throughout the United States.

44.     This was because the conspiracy permitted the Defendants to fix, raise, maintain, and/or stabilize the prices paid by OEMs in order to set a floor for the prices paid by all other direct purchasers of Power Window Motors.

45.     As a result of the conspiracy, OEMs and all or nearly all other direct purchasers of Power Window Motors paid supra-competitive prices for those products.

**E.  Government Investigations and Guilty Pleas**

46.     Government officials in the United States, Europe, Canada, and Japan have been involved in a globally coordinated antitrust investigation for several years involving automotive parts, including Power Window Motors.  The investigation began in Europe after some European OEMs lodged a complaint with the European Commission ("EC").

47.     As a result of this investigation, United States, European, and Japanese authorities executed surprise raids in February 2010 at the offices of several automotive parts manufacturers, including some of the Defendants.   To obtain search warrants for the raids

11

conducted in the United States, the government was legally required to demonstrate probable cause that it would obtain evidence of an antitrust violation as result of executing the warrant—*i.e.*, the United States must have presented sufficient evidence to the magistrate to convince him or her that a person of reasonable caution would believe that raiding these offices would uncover additional evidence of antitrust violations.

48.     As of the filing of this Complaint, thirty-five (35) companies and twenty-nine (29) executives have pled guilty or agreed to plead guilty as a result of the DOJ's automotive parts investigation, resulting in more than $2.5 billion in criminal fines and dozens of prison sentences.

49.     According to the FBI's Special Agent in Charge Andrew G. Arena, "This criminal activity has a significant impact on the automotive manufacturers in the United States, Canada, Japan and Europe and has been occurring at least a decade.  The conduct had also affected commerce on a global scale in almost every market where automobiles are manufactured and/or sold."

**Mitsuba Has Pled Guilty to Price-Fixing Power Window Motors**

50.     On September 26, 2013, the DOJ announced that Defendant Mitsuba Corporation agreed to plead guilty to participating in a conspiracy regarding Power Window Motors and other parts from at least as early as January 2000 until at least February 2010.  As part of its guilty plea, Mitsuba Corporation agreed to pay a $135 million fine.

51.     Defendant Mitsuba Corporation pled guilty to two counts: (1) participating in a combination or conspiracy to fix, stabilize, and maintain the prices of automotive parts, including Power Window Motors, in violation of the Sherman Act; and (2) altering, destroying, and

concealing evidence with the intent to impede, obstruct, and influence the government's investigation of its anticompetitive activities.

52.     Its plea agreement covered not only itself but its "related entities" or "subsidiaries," including Defendant American Mitsuba Corporation.  Furthermore, it included a promise by the DOJ not to prosecute its "related entities for any act or offense committed before the date of signature of this Plea Agreement [...] that was undertaken in furtherance of an antitrust conspiracy involving the manufacture or sale of automotive parts[.]"  In addition, the Mitsuba plea agreement required cooperation from its related entities (*i.e.*, its subsidiaries).

53.     According to the Information filed against it, Defendant Mitsuba Corporation and its co-conspirators carried out their conspiracy by, among other things:

(a)     participating in meetings, conversations, and communications in the United States and elsewhere to discuss the bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

(b)     agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

(c)     agreeing, during those meetings, conversations, and communications, to allocate the supply of automotive parts sold to automobile manufacturers in the United States and elsewhere;

(d)     agreeing, during those meetings, conversations, and communications, to coordinate price adjustments requested by automobile manufacturers in the United States and elsewhere;

(e)     submitting bids, price quotations, and price adjustments to automobile manufacturers in the United States and elsewhere in accordance with the agreements reached;

(f)     selling automotive parts to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

13

(g)     accepting payment for automotive parts sold to automobile manufacturers in the United State and elsewhere at collusive and noncompetitive prices;

(h)     engaging in meetings, conversations, and communications in the United States and elsewhere for the purpose of monitoring and enforcing adherence to the agreed-upon bid-rigging and price-fixing scheme; and

(i)     employing measures to keep their conduct secret, including, but not limited to, using code names and meeting at remote locations.

54.     Mitsuba's employees took affirmative steps to obstruct the DOJ's criminal investigation into its collusive conduct. According to its plea agreement, in February 2010, some of Mitsuba's employees became aware of a criminal investigation into the automotive parts industry when one of its co-conspirator's located in this District was searched by United States law enforcement authorities. Over the next several days, the employees took steps to conceal or destroy incriminating evidence. Some of the employees involved in these efforts were Mitsuba's senior executives and board members; some were contemporaneously employed by Defendant Mitsuba Corporation and Defendant American Mitsuba Corporation.

**DENSO and Bosch Have Pled Guilty to Price-Fixing Other Automotive Parts**

55.     DENSO and Bosch have pled guilty to participating in combinations or conspiracies to fix, stabilize, and maintain the prices of other automotive parts in violation of the Sherman Act.

56.     On January 30, 2012, the DOJ announced that Defendant DENSO Corporation had agreed to pay a $78 million fine and plead guilty to a two-count criminal Information charging it with: (1) participating in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, electronic control units ("ECUs") sold to an automobile manufacturer in

14

the United States and elsewhere from at least as early as January 2000 and until at least February 2010 in violation of the Sherman Antitrust Act, 15 U.S.C. § 1; and (2) participating in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, heater control panels ("HCPs") sold to an automobile manufacturer in the United States and elsewhere from at least as early as January 2000 and continuing until at least February 2010 in violation of the Sherman Act, 15 U.S.C. § 1 .

57.     Defendant DENSO Corporation's subsidiary, Defendant DENSO International Korea Corporation, was a member of the DENSO family that performed manufacturing and/or marketing and sales operations with respect to sales of products to Korean automobile manufacturers.  For DENSO to effectuate the conspiracy to fix prices and rig bids on, among other products, Power Window Motors, Defendant DENSO International Korea Corporation was a designated entity for rigging bids in response to RFQs issued by Korean automobile manufacturers.

58.     On March 31, 2015, the DOJ announced that Defendant Robert Bosch GmbH had agreed to pay a $57.8 million fine and plead guilty to a one-count Information charging it with conspiring to allocate the supply of, rig bids for, and to fix, stabilize, and maintain the prices of, (a) spark plugs and oxygen sensors sold from at least as early as January 2000 until at least July 2011, and (b) starter motors sold from at least January 2009 until at least June 2010.

59.     According to Deputy Assistant Attorney General Brent Snyder of the Antitrust Division's Criminal Enforcement Program, "The participants in this conspiracy were not located in just one country or region of the world."   Snyder further stated, "Collusion related to

automotive parts was global in nature and our efforts to hold responsible companies and individuals accountable for the resulting harm to U.S. consumers and businesses."

60.     According to the criminal Informations filed against them, Defendants DENSO Corporation and Robert Bosch GmbH (together with their co-conspirators) carried out the conspiracies by, among other things:

(a)     participating in meetings, conversations, and communications in the United States and Japan to discuss the bids and price quotations to be submitted to certain automobile and internal combustion engine manufacturers in the United States and elsewhere;

(b)     agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to certain automobile and internal combustion engine manufacturers;

(c)     agreeing, during those meetings, conversations, and communications, to allocate the supply of automotive parts sold to automobile and internal combustion engine manufacturers in the United States and elsewhere, in some cases on a model-by-model or an engine-specific basis;

(d)     agreeing, during those meetings, conversations, and communications, to coordinate price adjustments requested by certain automobile and internal combustion engine manufacturers in the United States and elsewhere;

(e)     submitting bids, price quotations, and price adjustments to certain automobile and internal combustion engine manufacturers in the United States and elsewhere in accordance with the agreements reached;

(f)     selling automotive parts to certain automobile and internal combustion engine manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

(g)     accepting payment for automotive parts sold to certain automobile and internal combustion engine manufacturers in the United States and elsewhere at collusive and non-competitive prices;

    (h)    engaging in meetings, conversations, and communications for the purpose of monitoring and enforcing adherence to the agreed-upon bid-rigging and price-fixing scheme; and

    (i)    employing measures to keep their conduct secret, including but not limited to using code names and meeting at private residences or remote locations.

## ANTITRUST INJURY

61.    Defendants' conspiracy suppressed price competition among Defendants, causing prices for Power Window Motors to be artificially inflated throughout the Class Period.

62.    As a result, Plaintiff and the members of the Class paid supra-competitive prices for Power Window Motors and were deprived of the benefits of a competitive market throughout the Class Period.

63.    Therefore, as a direct and foreseeable result of Defendants' conspiracy, Plaintiff and the members of the Class have been injured in their business or property in that they paid more for Power Window Motors than they would have in the absence of Defendants' unlawful and anticompetitive conduct.

## CLASS ACTION ALLEGATIONS

64.    Plaintiff brings this action both on behalf of themselves and all others similarly situated (the "Class") pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2) and (b)(3). The Class is defined as follows:

> All individuals and entities that purchased Power Window Motors in the United States directly from one or more Defendants or their co-conspirators (or their controlled subsidiaries, affiliates, or joint ventures) from January 1, 2000 through the present.

65.    Plaintiff does not know the exact number of Class members, such information being in the exclusive control of Defendants.  Due to the nature of the trade and commerce

17

involved, however, Plaintiff believes that the members of the Class are so numerous and geographically dispersed throughout the United States that joinder of all Class members is impracticable.

66.     There are questions of law or fact common to the Class, including, but not limited to, the following:

(a)     Whether Defendants engaged in a contract, combination, or conspiracy to fix, raise, maintain, or stabilize prices of Power Window Motors sold in the United States;

(b)     The identity of the participants of the alleged conspiracy;

(c)     The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(d)     Whether the alleged conspiracy violated Section 1 of the Sherman Act;

(e)     Whether the contract, combination, or conspiracy caused Power Window Motors prices to be higher than they would have been in the absence of Defendants' conduct;

(f)     Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiff and the other Class members;

(g)     Whether the Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from the Plaintiff and other Class members;

(h)     Whether Plaintiff and other Class members are entitled to injunctive relief and, if so, the nature and extent of such relief; and

(i)     The appropriate class-wide measure of damages.

18

67.     These and other questions of law and fact are common to the Class and predominate over any questions affecting only individual Class members.

68.     Plaintiff's claims are typical of the claims of the Class because Plaintiff directly purchased Power Window Motors from one or more of the Defendants and/or their co-conspirators, all Class members were damaged by the same conspiracy alleged herein, and the relief sought by Plaintiff is common to the Class.

69.     Plaintiff will fairly and adequately represent the interests of the Class in that Plaintiff is a direct purchaser of Power Window Motors and has no conflict with any other members of the Class.   Furthermore, Plaintiff has retained competent counsel experienced in antitrust, class action, and other complex litigation.

70.     Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

71.     A class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy.   Prosecution of this matter as a class action will eliminate the possibility of repetitive litigation and there are no inherent barriers to managing the case as a class action.

72.     The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying outcomes.

73.     The Class is also readily definable and is one for which records likely exist in the files of Defendants.

**PLAINTIFF'S CLAIMS ARE TIMELY**

74.     Plaintiff and the members of the Class had no knowledge of the anticompetitive conduct alleged herein, or of facts sufficient to place them on notice of the claims set forth

herein, until, at the earliest, September 26, 2013. On that date, the DOJ publicly announced the impending guilty pleas of Defendant Mitsuba Corporation with respect to Power Window Motors.

75.    As a result, Plaintiff and the members of the Class did not discover, nor could they have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein, until September 26, 2013. Prior to that time, there was insufficient information to suggest that any of the Defendants was involved in a conspiracy to fix prices, rig bids, or allocate the market for Power Window Motors.

76.    Moreover, fraudulent concealment tolled the statute of limitations on the claims asserted herein by Plaintiff and the members of the Class until at least September 26, 2013. Defendants affirmatively and wrongfully concealed their anticompetitive conduct since the Class Period began.

77.    Defendants' conspiracy, by its very nature, was inherently self-concealing. Moreover, because Power Window Motors are not exempt from antitrust regulation, and because the price for Power Window Motors was set through an RFQ process that Plaintiff and members of the class had reason to believe was competitive, Plaintiff and the members of the Class reasonably believed they were making Power Window Motors purchases in a competitive industry.

78.    In addition, Defendants took affirmative steps to conceal their conspiracy and carry it out in a manner that would preclude detection. For example, Defendants have used code names and met in remote locations in order to keep their anticompetitive conduct secret.

79.     One or more of the Defendants have already pled guilty to purposefully destroying evidence to avoid detection.  For example, the Plea Agreement for Defendant Mitsuba Corporation states:

> On or about February 24, 2010, Executive A of [Mitsuba Corporation] learned that the offices of a conspirator of [Mitsuba Corporation] located in the Eastern District of Michigan had been searched by Federal law enforcement authorities in connection with an investigation of possible violations of U.S. antitrust law. At all times during the relevant period, Executive A was a senior executive of [Mitsuba Corporation] and of its subsidiary American Mitsuba Corporation, and was a member of [Mitsuba Corporation's] Board of Directors. Executive A, while physically present in the Eastern District of Michigan, in relation to and in contemplation of an investigation of the defendant's conduct described in Paragraphs 4(a)-(d) of this Plea Agreement, and intending to obstruct such investigation, directed certain of his subordinates to conceal and destroy documents and electronic files relating to the conduct described in Paragraphs 4(a)- (d) that were in the possession, custody and control of [Mitsuba Corporation] and American Mitsuba Corporation in both the United States and Japan. Executive A's subordinates and other employees of the defendant took acts in the Eastern District of Michigan and elsewhere to conceal and destroy such evidence, and did conceal and destroy such evidence. Within several days after the aforementioned search, Executive B of [Mitsuba Corporation], a senior executive of [Mitsuba Corporation] and a member of [Mitsuba Corporation's] Board of Directors, and Executive C, a senior executive of [Mitsuba Corporation], also became aware of the search and directed certain of their subordinates and other employees that documents and electronic files in the possession, custody and control of [Mitsuba Corporation] in Japan should be concealed and destroyed.  Executive B's and C's subordinates and other employees took acts to conceal and destroy such evidence, and did conceal and destroy such evidence.

80.     Because Defendants' anticompetitive conduct was both self-concealing and affirmatively concealed, Plaintiff and the members of the Class did not learn or discover the operative facts giving rise to this Complaint prior to September 26, 2013.  No information, actual or constructive, was ever made available to Plaintiff and the members of the Class that would have led a reasonably diligent person to investigate whether a conspiracy existed prior to September 26, 2013.

81.     For these reasons, the statute of limitations applicable to Plaintiff and the Class's claims did not begin to run or were otherwise tolled until September 26, 2013.

**CLAIM FOR RELIEF**
**Violation of Section 1 of the Sherman Act**
**(Against All Defendants)**

82.     Plaintiff incorporates by reference all of the above allegations as if fully set forth herein.

83.     During the Class Period, Defendants and their co-conspirators entered into a continuing agreement, combination, or conspiracy in restraint of trade to artificially raise, fix, maintain, or stabilize prices for Power Window Motors sold in or into the United States.

84.     As horizontal competitors, Defendants' agreement, combination, or conspiracy thus constitutes a *per se* violation of the federal antitrust laws.

85.     In accordance with this agreement, combination, or conspiracy, Defendants and their co-conspirators endeavored to and succeeded in rigging bids, allocating the market, and fixing prices for Power Window Motors sold in or into the United States during the Class Period.

86.     In furtherance of their conspiracy, Defendants and their co-conspirators took at least the following affirmative actions:

(a) Participated in meetings, conversations, and communications to discuss the bids and price quotations for Power Window Motors to be submitted to direct purchasers in the United States;

(b) Agreed on bids and price quotations for Power Window Motors to be submitted to direct purchasers in the United States;

(c) Submitted bids and price quotations to direct purchasers of Power Window Motors in accordance with the agreements reached;

22

(d) Manipulated prices and allocated supply of Power Window Motors sold in or into the United States;

(e) Coordinated price adjustments for Power Window Motors sold in or into the United States;

(f) Sold Power Window Motors in or into the United States at supra-competitive prices; and

(g) Actively concealed the true nature of their unlawful conduct from Plaintiff and the members of the Class in furtherance of the conspiracy.

87.     As a direct and proximate result of the conduct described above, Plaintiff and the members of the Class have been injured in their business and property in that they paid more for Power Window Motors during the Class Period than they would have absent the anticompetitive conduct of Defendants and their co-conspirators.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment on its behalf and on behalf of the Class proposed herein, and respectfully requests the following relief:

A.     That the Court determine that this action may proceed as a class action under Rule 23 of the Federal Rules of Civil Procedure, with Plaintiff as the designated Class representative and its counsel as Class Counsel;

B.     That the contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators as alleged in this complaint, be adjudicated and decreed a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. §1;

C.     That Plaintiff and members of the Class recover damages sustained by them, as provided by the federal antitrust laws, and that a joint and several judgment in favor of Plaintiff

and the Class be entered against the Defendants in an amount to be trebled in accordance with the antitrust laws pursuant to 15 U.S.C. §15(a);

       D.      That Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents and employees thereof and all other persons acting or claiming to act on their behalf be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy or agreement alleged herein;

       E.      That Plaintiff and members of the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law;

       F.      That Plaintiff and members of the Class be awarded pre-judgment and post-judgment interest in accordance with law; and

       G.      That Plaintiff and members of the Class receive such other or further relief as may be just and proper.

## JURY TRIAL DEMANDED

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury of all of the claims asserted in this Complaint so triable.


Dated:  May 20, 2015                Respectfully submitted,


                                    */s/ Aubrey H. Tobin*
                                  Aubrey H. Tobin (P31256)
                                  Attorney at Law, P.C.
                                  2140 Walnut Lake Road
                                  West Bloomfield, MI 48323
                                  Telephone: (248) 932-3070
                                  Aubrey@tobinpc.com

M. John Dominguez
COHEN MILSTEIN SELLERS
& TOLL PLLC
2925 PGA Boulevard, Suite 200
Palm Beach Gardens, FL 33410
Telephone: (561) 515-1431
jdominguez@cohenmilstein.com

David A. Young
COHEN MILSTEIN SELLERS
& TOLL PLLC
1100 New York Ave. NW, Suite 500 West
Washington, D.C. 20005
Telephone: (202) 408-4600
dyoung@cohenmilstein.com

Matthew W. Ruan
COHEN MILSTEIN SELLERS
& TOLL PLLC
88 Pine Street, 14th Floor
New York, NY 10005
Telephone: (212) 838-7797
mruan@cohenmilstein.com

Christopher J. Cormier
COHEN MILSTEIN SELLERS
& TOLL PLLC
2443 S. University Boulevard, #232
Denver, CO 80210
Telephone: (720) 583-0650
ccormier@cohenmilstein.com

Solomon B. Cera
Thomas C. Bright
Pamela A. Markert
CERA LLP
595 Market Street, Suite 2300
San Francisco, CA 94105-2835
Telephone: (415) 777-2230
scera@cerallp.com
tbright@cerallp.com
pmarkert@cerallp.com